UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------ x
ROBERT J. VOSATKA, PH.D., M.D.,     :     04 Civ. 2936 (LAP)
                                  :
           Plaintiff,         :     **OPINION AND ORDER**
                                    :
      -against-           :
                                    :
COLUMBIA UNIVERSITY,          :
                                    :
           Defendant.       :
------------------------------------ x

LORETTA A. PRESKA, U.S.D.J.:

Plaintiff Robert Vosatka, Ph.D., M.D. ("Vosatka"), commenced this action on April 2, 2004, by filing a complaint against Columbia University ("Columbia") alleging employment discrimination in violation of the Americans with Disabilities Act ("ADA") and various related state law claims (the "Complaint"). Columbia now moves for summary judgment on all claims. For the reasons set forth below, Columbia's motion is granted.

BACKGROUND

I. Vosatka's Employment at Columbia University

Vosatka was appointed as an Assistant Professor of Pediatrics at Columbia University in 1997. Def. 56.1 ¶ 2.[1] By virtue of that appointment, Vosatka was a candidate for a tenured position. Def. 56.1 ¶ 1, 2. Faculty holding tenure-track positions are generally limited to a maximum of eight years of full-time service unless they

---

[1] "Def. 56.1" refers to Columbia's Rule 56.1 Statement dated January 3, 2005.

are granted tenure. Polin Decl.,[2] Ex. A at 44.[3]  An eight-year term is not guaranteed, however, and "any full-time appointment may be terminated at the end of its stated term, even if eight years of service have not been completed, as long as the officer is given adequate written notice." Polin Decl., Ex. A at 44.   The Faculty Handbook requires a "Notice of Non-Renewal" to be given at least twelve months before the end of an appointment after two or more years of full-time service. Polin Decl., Ex. G at 189.[4]  Non-tenured faculty members may continue after eight years if they are approved for clinical or practice appointments. Polin Decl., Ex. A at 44.  Clinical appointments must be confirmed in writing and require the approval of various University officials. Polin Decl., Ex. G at 188.

   As an Assistant Professor of Pediatrics, Vosatka worked as a research scientist and performed clinical duties. Pl. Aff. ¶ 24.[5] While Vosatka claims that Dr. Richard Polin[6] orally assured him that he would be considered for a clinical appointment if he were not

---

[2] "Polin Decl." refers to the Declaration of Dr. Richard Polin sworn to on January 3, 2004.

[3] "Polin Decl., Ex. A" refers to Exhibit A to Dr. Polin's Declaration, an excerpt from the Columbia University Faculty Handbook (the "Faculty Handbook").

[4] "Polin Decl., Ex. G" refers to Exhibit G to Dr. Polin's Declaration, an excerpt from the Faculty Handbook.

[5] "Pl. Aff." refers to Vosatka's Affirmation dated January 28, 2005.

[6] Dr. Polin has been the Chief of the Division of Neonatology within the Department of Pediatrics at Columbia University since 1998. Polin Decl. ¶ 1.

granted tenure, Pl. Aff. ¶ 31,[7] Vosatka never received such assurances in writing, Vos. Tr. A at 64.[8]

## II. Vosatka's Injuries

In November 1999, Vosatka ruptured his Achilles tendon. Pl. Aff. ¶ 4.  In March 2001, Vosatka suffered from a related infection and experienced complications that resulted in more than seventeen surgeries. Vos. Tr. A at 105, 119.  Vosatka was granted a fully-paid medical leave from March 2001 until May 2002. Def. 56.1 ¶ 24. Although Vosatka is capable of walking "completely alone without any unassisting [sic] devices except for some support stockings," Vos. Tr. A  at 113, Vosatka alleges that he cannot walk "too far" and tends to sit with his foot raised, Vos. Tr. A at 107, 115.  In spite of his injury, Vosatka attempts to exercise occasionally and tries to help repair around the house. Vos. Tr. A at 115-16.

Before his medical leave, Vosatka received a fourth-year review, in which it was determined that he was an unlikely candidate for tenure. Polin Decl., Ex. B.[9]  The reviewers cited Vosatka's low productivity, which they recognized was partially due to a laboratory

---

[7]In considering Columbia's motion for summary judgment, I view the facts in the light most favorable to the non-moving party, the plaintiff. United States v. Diebold, Inc., 369 U.S. 654, 655 (1982).  Additionally, I will not address those facts in dispute that are immaterial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[8]"Vos. Tr. A" refers to the transcript of Vosatka's deposition taken on September 20, 2004.

[9]"Polin Decl., Ex. B" refers to Exhibit B of Dr. Polin's Declaration, a letter from Dr. Leibel and Dr. Brittenham addressed to Dr. Driscoll regarding Plaintiff's fourth-year review.

fire and a medical problem, and his low national visibility in the research community as reasons for their decision. Polin Decl., Ex. B.

While Vosatka was on leave, Columbia assisted him in acquiring a disability supplement to enable him to continue his research. Def. 56.1 ¶ 26. Approximately $2,000 of the supplement funded equipment to assist Vosatka in his work duties. Vos. Tr. A at 121.[10] Technicians were also assigned to help Vosatka with his work because he "could no longer stand for long hours at the bench." Vos. Tr. B at 316.[11] Additionally, Vosatka requested an office adjacent to the laboratory to avoid walking and taking the stairs, and his office was subsequently moved to a location within the laboratory space. Vos. Tr. A at 142-44.

In 2002, upon his return to work, Vosatka informed Dr. Polin that he had difficulty doing clinical work because of his injury and requested that he not be assigned to that department. Vos. Tr. B at 320. Vosatka was subsequently removed from most or all of his clinical responsibilities after August or September 2002. Def. 56.1 ¶ 29. Thereafter, Vosatka never communicated an interest in returning to his clinical responsibilities or any ability to do so. See Vos. Tr. B at 321.

---

[10]The disability supplement had a budget of $180,000. Although Vosatka claims that virtually no funds were expended on his behalf despite his repeated requests, Vosatka's deposition testimony contradicts that proposition. Vosatka concedes that there was nothing he requested from Columbia with regard to his Achilles tendon injury that he did not receive. Vos. Tr. 154-57. This apparent factual dispute is not a genuine dispute because Vosatka may not create a material issue of fact by submitting an affidavit disputing his own testimony. Jacques v. DiMarzio, Inc., 386 F.3d 192, 204 (2d Cir. 2004).

[11]"Vos. Tr. B" refers to the transcript of Vosatka's deposition taken on September 23, 2004.

III. <u>The NIH Training Grant</u>

While Vosatka was on medical leave, he was assigned to assist Dr. Polin and Dr. Raymond Stark[12] in drafting an NIH Training Grant proposal. Def. 56.1 ¶ 34. The proposal was not submitted in 2002 as planned, so Vosatka continued to work on it to meet the 2003 deadline. Vos. Tr. B at 372, 375. In order for a grant proposal to be submitted, the grant must be approved by various University officials. Vos. Tr. B at 378. Vosatka informed Dr. Polin that he believed a provision in the NIH Training Grant would violate a provision in the New York Health Law because the grant could require postgraduate fellows working under the grant to work more hours than were permitted under the New York State law. Pl. Aff. ¶ 32; Vos. Tr. B at 379. Vosatka asserts that Dr. Polin planned to instruct the fellows only to record their clinical hours but not their research hours in order to avoid detection. Pl. Aff. ¶ 33. In or about January or February 2003, Vosatka refused to work on the grant application further because he believed that it would violate New York regulations. Vos. Tr. B at 376; Pl. Aff. ¶ 34. No fellows have worked in connection with the NIH Training Grant at Columbia because it has neither been submitted nor funded to date. Polin Decl. ¶ 19.

---

[12]Dr. Stark is the Director of Neonatal/Perinatal Research at Columbia University. Polin Decl. ¶ 11.

IV. <u>Vosatka's Conduct Toward Women</u>[13]

      Vosatka shared his laboratory space with other researchers, fellows, and technicians. Vos. Tr. A at 189-93.  In 2003, several of Vosatka's female subordinates and colleagues complained about his behavior in the lab. Def. 56.1 ¶¶ 43, 52-53.  In one incident, Vosatka "had a couple of beers with friends" at a conference in California and sent an e-mail at 4:21 a.m. to Ms. Taylor, a female postdoctoral fellow who was a subordinate of his in the lab. Vos. Tr. A at 192-93, 201-202.  The subject of the e-mail was "is thi [sic] you?," and, in the text, Vosatka included two links to sexually explicit websites and asked "or is this you?" Garland Decl.,[14] Ex. A.[15]  Vosatka had "Googled" Ms. Taylor's name in an effort to find her e-mail address and was directed to several explicit websites of other women with the same name who appeared to be selling sexual services. Vos. Tr. A at 200-203; Garland Decl., Ex. A.  Although Vosatka knew that the women in those websites were not the same Ms. Taylor as the one with whom he worked, Vosatka thought it was amusing to send Ms. Taylor the links. Vos. Tr. A at 205.

_____

[13]Because Plaintiff claims that the facts regarding his conduct in the lab, listed in Def. 56.1 ¶¶ 43-62, 64-67, are immaterial, I understand him to be taking the position that they do not constitute disputed issues of material fact on Defendant's motion for summary judgment. <u>See</u> <u>Western World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d Cir. 1990)("the existence of disputed facts that are immaterial to the issues at hand is no impediment to summary judgment.").

[14]"Garland Decl." refers to the Declaration of Dr. Marianne Garland dated January 3, 2005.

[15]"Garland Decl., Ex. A" refers to Exhibit A to Dr. Garland's Declaration, which includes a copy of the e-mail from Plaintiff to Ms. Taylor and copies of the web pages that were linked to the e-mail.

Dr. Marianne Garland, the senior female faculty member in the lab, received complaints from several female employees of the lab who had seen the e-mail and found it offensive. Def. 56.1 ¶¶ 51-52; Garland Decl. ¶ 4. Additionally, the females in the lab complained to Dr. Garland that Vosatka made a number of sexual comments and offensive jokes that made them uncomfortable. Garland Decl. ¶ 5. They told Dr. Garland that Plaintiff treated his female subordinates poorly and did not interact with them in a respectful manner. For example, Vosatka once told the younger female employees that he lost ten pounds by circumcision. Garland Decl. ¶ 5.

Dr. Garland and Dr. Michael Myers[16] arranged a meeting between Vosatka and the female lab employees to resolve their problems. Garland Decl. ¶ 7. The women thereafter reported to Dr. Garland that they were further offended by Vosatka's comments during the meeting that "women's menstrual cycles become synchronized when they work together." Def. 56.1 ¶ 58; Vos. Tr. A at 223-24. Vosatka also mentioned during the meeting that perhaps the women were complaining because they were "all simultaneously having Pre-Menstrual Syndrome." Def. 56.1 ¶ 59. Perhaps not surprisingly, Dr. Myers and the female employees did not feel that the meeting was successful, Vos. Tr. B at 246-47, so they notified Dr. Polin of the problems between Vosatka and the female employees in the lab, Garland Decl. ¶ 10. Dr. Polin asked Vosatka to stay at home while the Dean of Academic Affairs

---

[16]Dr. Myers is a senior faculty member who had collaborated on grants with Plaintiff. Garland Decl. ¶ 7.

investigated the complaints. Pl. Aff. ¶ 12.  After the Dean

determined that Vosatka had not violated any University rules,

Pl. Aff. ¶ 16, Dr. Polin arranged a meeting among Vosatka,

Dr. Garland, and the University Ombudsperson to mediate a resolution

that would permit Vosatka to return to work in the lab, Def. 56.1

¶¶ 64-65.  During that meeting, Vosatka accused Dr. Stark of

committing physical assault against Dr. Garland, which Dr. Garland

denied. Vos. Tr. B at 272; Garland Decl. ¶ 15.  He also claimed that

Dr. Stark "told both [Vosatka and Dr. Garland] that he had taken

morphine from the laboratory" and "used it to inject his neighbor who

was dying . . . . He did mention that it was the dose that, in his

experience in doing this, would be sufficient to terminate his life."

Vos. Tr. B at 272, 273-75, 277.  Dr. Garland denied hearing this

information, and Vosatka offered no evidence to support his

allegations. Vos. Tr. B at 281.


V. Psychiatric Evaluation

        After Dr. Polin was informed of Vosatka's "erratic behavior"

and "bizarre allegations" during his meeting with the Ombudsperson,

Dr. Polin put Vosatka on medical leave and required Vosatka to

undergo a psychiatric evaluation to determine his fitness to return

to work. Def. 56.1 ¶ 69.  The Faculty Handbook allows the University

to require an officer of instruction to "undergo a medical

examination by a physician . . . in any case in which a question of

medical disability arises." Polin Decl., Ex. G at 190.  Dr. Owens, a

psychiatrist, determined that Vosatka showed indications of

personality problems that likely contributed to his conflicts with

co-workers. Polin Decl., Ex. J.[17]  Dr. Owens indicated that Vosatka

"lack[s] awareness of the impact of his actions on others" and is

"relatively impervious to objective criticism." Polin Decl., Ex. J.

Although Dr. Owens concluded that Vosatka was "not impaired by any

major mental illness, and he is cognitively and emotionally able to

return to work," he suggested that Vosatka not continue to work with

the people with whom he had conflicted. Polin Decl., Ex. J.

Dr. Rosenfeld, a clinical psychologist, determined that Vosatka has a

"tendency to feel unfairly treated [which] is likely to lead to

problems in work environments." Polin Decl., Ex. J.  Dr. Rosenfeld

also believed that Vosatka's personality traits were likely to

"significantly hinder his interpersonal functioning both at work and

in social relationships." Polin Decl., Ex. J.  Dr. Polin opined that

Vosatka was fit to continue his work as a research scientist but

"based on the findings of the psychiatric report, [he] informed

[Plaintiff] that he could not return to his previous laboratory.

This conclusion resulted in [Plaintiff's] not being able to work on

the grant from which he derived the majority of his salary support."

Polin Decl. ¶ 28.


VI. Notice of Non-Renewal

     On June 3, 2003, Vosatka met with Dr. Polin and Dr. Driscoll,

the Chair of the Pediatrics Department, and was informed that he

would be receiving a Notice of Non-Renewal but that his salary would

continue to be paid until June 30, 2004. Polin Decl. ¶ 30.  Dr. Polin

---

[17]"Polin Decl., Ex. J" refers to Exhibit J to Dr. Polin's
Declaration, which consists of copies of the evaluations of both
Dr. Owens and Dr. Rosenfeld.

and Dr. Driscoll informed Vosatka that his services were no longer necessary because he could not return to his previous lab. Vos. Tr. B at 309. Although they sought to find Vosatka another position within the University where Vosatka could continue to derive salary support, Vosatka did not follow through with those opportunities. Polin Tr. at 70-73;[18] Vos. Tr. B at 320-29. Dr. Driscoll made several inquiries to identify alternative laboratory opportunities for Vosatka. He spoke with Dr. Libel, who had no lab space available. Vos. Tr. B at 311. Dr. Driscoll also suggested that Plaintiff explore working with Dr. Chung. Polin Decl. ¶ 29; Vos. Tr. B at 310. Although Dr. Chung expressed interest in working with Vosatka, Vos. Tr. B at 322, Vosatka declined to pursue the opportunity, Vos. Tr. B at 324. Dr. Chung had explained to Vosatka that her clinical service was "very busy." Vos. Tr. B at 321. Vosatka believed that he would be incapable "of working around the entire hospital," so there was "no physical way" he could follow up. Vos. Tr. B at 324. At no point, however, did Vosatka inform Dr. Chung or Dr. Driscoll of any mobility problems or inquire as to whether he would be able to work with Dr. Chung in spite of his injury. Vos. Tr. B at 327. Additionally, although Dr. Myers expressed interest in working with Vosatka on a grant application for the following year, Vosatka did not follow through with that opportunity and eventually "just lost communication" with Dr. Myers. Vos. Tr. B at 329.

---

[18]"Polin Tr." refers to the transcript of Dr. Polin's deposition taken on September 29, 2004.

VII. <u>St. Peter's Evaluation</u>

        In February 2004, Dr. Polin received a request to evaluate
Vosatka for a position at St. Peter's Hospital. Polin Decl.,
Ex. M.[19]  In several categories, Dr. Polin gave Vosatka a score of
"good," the second highest rating, but Vosatka believes he should
have been scored as "superior." Vos. Tr. B at 351-54.  In the
category of "Cooperativeness/Ability to Work with Others," Vosatka
received a "fair" rating, with which Vosatka also disagreed. Vos. Tr.
B at 354-55; Polin Decl., Ex. M.  Additionally, Dr. Polin declined to
rate Vosatka in certain categories and instead marked "unable to
comment" on the evaluation. Polin Decl., Ex. M.  One of the
categories marked "unable to comment" asked whether the applicant had
"ever been subjected to any disciplinary action, such as admonition,
reprimand, suspension or termination." Polin Decl., Ex. M.  On the
evaluation, Dr. Polin noted that he was evaluating Vosatka based on
"general impression." Polin Decl., Ex. M.  Because Vosatka considers
the evaluation to be "among the worst of evaluations that a
neonatologist can receive," Plaintiff believes that Dr. Polin
intended to prevent Vosatka from securing the position at St. Peter's
Hospital. Vos. Tr. B at 363.  Vosatka claims that
Dr. Polin completed the evaluation inaccurately and left out
information, causing the Chairman of Pediatrics at St. Peter's
Hospital to consider his application "incomplete." Vos. Tr. B at 345.
Dr. Polin asserts that he completed the form accurately and to the

_____

        [19]"Polin Decl., Ex. M" refers to Exhibit M to Dr. Polin's
Declaration, a copy of the evaluation that Dr. Polin completed
for St. Peter's Hospital.

best of his knowledge and that he did not intend to prevent Vosatka from receiving the position at St. Peter's Hospital. Polin Decl. ¶¶ 33, 36.


## DISCUSSION


I. The Standard

    A. Summary Judgment Pursuant to Rule 56

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden to inform the district court of the basis for its motion and to set forth the documents it believes demonstrate the absence of any issue of material fact. Id. at 323. Once the movant meets its burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In determining whether to grant summary judgment, the court must view the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(citing Diebold, 369 U.S. at 655). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v.

<u>Prudential Residential Servs., Ltd.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).

Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. However, "the mere existence of <u>some</u> alleged factual dispute" alone, or a factual dispute that is "irrelevant or unnecessary," will not be sufficient to defeat summary judgment. <u>Id.</u> at 247, 248. Evidence that is "merely colorable" or "not significantly probative" will also not preclude summary judgment. <u>Id.</u> at 249-50. Additionally, a plaintiff cannot "create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." <u>Hayes v. N.Y.C. Dep't of Corr.</u>, 84 F.3d 614, 619 (2d Cir. 1996).

B. <u>Employment Discrimination Claims</u>

The ADA makes it unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. ¶ 12112(a) (2005). In cases involving ADA claims, courts apply the procedure set forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[20] In <u>McDonnell Douglas</u>, the Court articulated a burden-

_____

[20]<u>McDonnell Douglas</u> was a case involving Title VII of the Civil Rights Act of 1964. Since then, courts have applied the same procedure to cases involving many other types of discrimination. <u>See</u> <u>Raytheon Co. v. Hernandez</u>, 540 U.S. 44 (2003)(applying the <u>McDonnell Douglas</u> analysis to an ADA claim); <u>Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown</u>, 294 F.3d 35 (2d Cir. 2002)(applying the <u>McDonnell Douglas</u> analysis to ADA claims involving both intentional discrimination and

(continued...)

shifting analysis that allocates the burden of proof in "a private non-class action challenging employment discrimination." Id. at 800. A plaintiff carries the initial burden to establish a prima facie case under the statute. Id. at 802. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly wrongful actions. Id.; Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981). If the defendant carries this burden, the plaintiff must demonstrate that the defendant's proffered reason is a pretext for discrimination. See St. Mary's Honor Ctr., et al. v. Hicks, 509 U.S. 502, 508 (1993). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. In demonstrating pretext, it is not enough "to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." St. Mary's, 509 U.S. at 519. If the plaintiff cannot prove, by a preponderance of the evidence, that the defendant's proffered reason is pretextual, then summary judgment is appropriate. See Burdine, 450 U.S. at 256.

_____

(...continued)
    retaliation); Adams v. Master Carvers of Jamestown, Ltd., 91 Fed.
    Appx. 718 (2d Cir. 2004)(applying the McDonnell Douglas analysis
    to claims arising under the New York Human Rights Law).

14

II. <u>Application</u>

    A. <u>Vosatka's Discrimination Claims</u>

Vosatka claims that Columbia discriminated against him in violation of the ADA.  In order to make a prima facie case of disability discrimination under the ADA, Vosatka must show that (1) Defendant is subject to the ADA; (2) Vosatka suffers from a disability within the meaning of the ADA; (3) Vosatka could perform the essential functions of his job with or without reasonable accommodation; and (4) Vosatka was subject to an adverse employment action because of his disability.  <u>See</u> <u>Adams</u>, 91 Fed. Appx. at 720.

    1. <u>Disability</u>

The parties do not dispute that Columbia is subject to the ADA.  Thus, the first element of Vosatka's ADA claim is fulfilled.

To meet the second element of a prima facie case, Vosatka must demonstrate that he is disabled within the meaning of the statute.  The ADA defines disability as either:

    (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

    (B) a record of such an impairment; or

    (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (2005).  In determining whether Vosatka qualifies as disabled, I must (1) consider whether Vosatka is physically or mentally disabled; (2) identify the major life activity on which Vosatka relies; and (3) determine whether Vosatka's impairment substantially limits that major life activity.  <u>See</u> <u>Bragdon</u> <u>v. Abbott</u>, 524 U.S. 624, 631 (1998).  The Equal Employment

Opportunity Commission (the "EEOC") has defined Major Life Activities to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. 1630.2(i) (2005).[21]  In assessing whether Vosatka has a disability, "courts have been careful to distinguish impairments which merely affect major life activities from those that substantially limit those activities." Ryan v. Grae & Rybicki, 135 F.3d 867, 870 (2d Cir. 1998).  "Thus, whether a person has a disability under the ADA is an individualized inquiry," Sutton v. United Air Lines, 527 U.S. 471, 483 (1999), and the determination should be made on a "case-by-case basis," Reeves v. Johnson Controls World Servs, Inc., 140 F.3d 144, 151 (2d Cir. 1998).

Vosatka claims that he is disabled pursuant to 42 U.S.C. § 12102(2)(C), under which an individual is considered disabled if that individual is "regarded as having such an impairment" by his or her employer. Complaint ¶ 33(b).  This analysis requires a court to evaluate "the employer's perception of the employee, a question of intent, not whether the employee has a disability." Francis, 129 F.3d at 284;[22] accord Adams, 91 Fed. Appx. at 720 ("whether [Plaintiff] is in fact disabled is irrelevant.").  Moreover, "it is not enough . . . that the employer regarded the individual as somehow disabled;

_____

[21]The EEOC, the agency responsible for enforcing the ADA, has developed regulations that interpret the terms of the ADA. While the EEOC's regulations are not binding, the Court of Appeals accords "great deference" to the EEOC's interpretations. Francis v. City of Meriden, 129 F.3d 281, 284 (2d Cir. 1997).

[22]Although the Court of Appeals in Francis evaluated the claims under both the ADA and the Federal Rehabilitation Act of 1973 ("RHA"), the statutes "are very similar, [so] we look to caselaw interpreting one statute to assist us in interpreting the other." 129 F.3d at 285 n.4.

rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA." <u>Colwell v. Suffolk Co. Police Dep't</u>, 158 F.3d 635, 646 (2d Cir. 1998)(citing <u>Francis</u>, 129 F.3d at 286). Thus, Vosatka must demonstrate that Columbia regarded Vosatka as having an impairment that substantially limits him in a major life activity. <u>See id.</u> at 721.

At oral argument, Vosatka's counsel argued that Columbia regarded Vosatka as psychologically impaired because (1) Dr. Polin required Vosatka to take medical leave while submitting to a psychiatric evaluation, and (2) Columbia acted upon the negative language in the evaluation.

With respect to Vosatka's first argument, courts have consistently held that a request for an employee to obtain a medical evaluation alone is insufficient evidence of an employer's intent or perception regarding that employee. <u>See</u>, <u>e.g.</u>, <u>Doe v. Bd. of Educ. of Fallsburgh Cent. Sch. Dist.</u>, 63 Fed. Appx. 46, 49 (2d Cir. 2003)("this fact alone is insufficient"); <u>Colwell</u>, 158 F.3d at 647 (the fact that the exams were required "suggests no more than that their physical condition was an open question."); <u>Sullivan v. River Valley Sch. Dist.</u>, 197 F.3d 804, 811 (6th Cir. 1999)("requesting a mental evaluation does not indicate that an employer regards an employee as disabled"); <u>Cody v. CIGNA Healthcare of St. Louis, Inc.</u>, 139 F.3d 595, 599 (8th Cir. 1998)("a request for an evaluation is not equivalent to treatment of the employee as though she were substantially impaired."). The ADA permits employers to "make inquiries into the ability of an employee to perform job-related functions" by requesting a medical evaluation. 42 U.S.C.

§ 12112(d)(4)(B). "Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims under §§ 12112(a) and 12102(2)(C)." Eustace v. S. Buffalo Mercy Hosp., 36 Fed. Appx. 673, 675 (2d Cir. 2002). Thus, Columbia's mere request that Vosatka submit to a psychiatric evaluation is insufficient as a matter of law to demonstrate that Columbia considered Vosatka to be psychologically impaired.

Second, Vosatka argues that because Columbia acted upon the negative recommendations contained in the medical evaluations, Columbia must have believed that those evaluations indicated that Vosatka was mentally disabled and thus considered him to be disabled. Even if I were to assume that Dr. Polin relied on the negative language in the evaluations, that language did not indicate that Vosatka suffered from a mental impairment. Dr. Owens, a psychiatrist, noted that Vosatka held "maladaptive personality traits," however Vosatka "is not impaired by any major mental illness, and he is cognitively and emotionally able to resume work as a researcher and clinician." Polin Decl., Ex. J. Because Vosatka's evaluation merely characterized him as having maladaptive personality traits, and Dr. Owens determined that his "clinical history, clinical observation of his mental status, and the results of the MMPI-2 do not indicate the presence of any major mental disorder at present," no reasonable jury could find that the report characterized Vosatka as being mentally impaired. Polin Decl., Ex. J.[23] Accordingly, Vosatka has not proffered evidence from which a jury could find that Columbia regarded him as disabled because even if Columbia embraced

---

[23]Dr. Rosenfeld, a psychologist, issued a similar report.

the evaluations, the results of those evaluations do not support the contention that Vosatka was mentally impaired.[24]

Vosatka also asserts that "the order to undergo a psychiatric evaluation was not made in good faith," Pl. Opp. at 6, ¶ 9,[25] however, Vosatka cites no evidence from which the jury could so find. To the contrary, Vosatka has not disputed any of Columbia's assertions regarding Vosatka's inappropriate behavior. Vosatka concedes that he sent an e-mail to a female subordinate which led her and her colleagues to complain about its sexually suggestive nature. Pl. Aff. ¶ 11. Although he claims that this

---

[24]Plaintiff also asserts that Defendant discriminated against him in violation of the New York Human Rights Law ("NYHRL"). In the interest of judicial economy, I will exercise supplemental jurisdiction over this claim. City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997). The elements of a prima facie case and the McDonnell Douglas analysis of ADA claims also apply to claims brought pursuant to the NYHRL. Adams, 91 Fed. Appx. at 725 (citing Reeves, 140 F.3d at 154-57). However, the definition of "disability" is broader under the NYHRL than it is under the ADA. State Div. of Human Rights v. Xerox Corp., 65 N.Y.2d 213, 218 (1985). A plaintiff may qualify as disabled if he or she suffers from a medical impairment. Id. at 218-19. The impairment must "prevent[] the exercise of a normal bodily function, or [be] demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Exec. § 292(21)(a) (2005); Xerox, 65 N.Y.2d at 219. A plaintiff may also assert a violation of the NYHRL if an employer regards the employee as disabled within the meaning of the NYHRL. N.Y. Exec. § 292(21)(c). Because Vosatka relies on evaluations that do not indicate that Vosatka had a medically demonstrable impairment, under the same analysis as set forth as to the ADA, Columbia's acting on those evaluations is not sufficient to raise an issue as to whether Columbia regarded Vosatka as disabled within the meaning of the NYHRL. Additionally, even if Vosatka were regarded as disabled under the NYHRL, Plaintiff's NYHRL claim would also fail at the pretext analysis step. See, infra, II. C. at 28.

[25]"Pl. Opp." refers to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment dated January 19, 2005.

e-mail was consistent with the humor in the lab, Vosatka does not contend that others were similarly complained about. Pl. Aff. ¶¶ 13, 14. The parties agree that the Dean of Academic Affairs determined that no University policies had been violated and that a meeting was planned for Vosatka and the female lab employees to resolve their problems. Pl. Aff. ¶ 16; Vos. Tr. A at 221. It is undisputed that Vosatka made additional comments at that meeting that the women complained were offensive, which led to a subsequent meeting between Vosatka, Dr. Garland, and the University Ombudsperson. Vos. Tr. A at 221-24; Vos. Tr. B at 246, 265-68. Vosatka admits that during the meeting he accused Dr. Stark of (1) committing assault against Dr. Garland, and (2) telling Dr. Garland and Vosatka that he had euthanized a neighbor. Vos. Tr. B at 272-81. Vosatka offered no support for those allegations, which Dr. Garland denied. Vos. Tr. B at 281; Garland Decl. ¶ 15. Whether or not the allegations are true, Columbia had a legitimate concern about Vosatka's inappropriate behavior in the lab and Vosatka's admitted accusations regarding Dr. Stark during the meeting with the Ombudsperson. See Def. 56.1 ¶¶ 45-61, 66. No jury could fail to find that these undisputed incidents provide ample basis for Dr. Polin to inquire into Vosatka's psychological ability to work in the lab. Again, the good faith request for a psychiatric evaluation cannot provide a basis for a finding that Vosatka was regarded as psychologically disabled.

In any event, the undisputed evidence is that the evaluations ordered did not find Vosatka to be suffering from any major mental illness or defect that would prevent him from working but recommended

that he not return to the same laboratory; instead, it is also undisputed that Columbia followed those recommendations and suggested other lab opportunities to Vosatka, which he concedes he failed to pursue. See Vos. Tr. B at 320-29. The fact that Columbia sought to retain Vosatka as an employee as long as he was assigned to a different lab is wholly inconsistent with Vosatka's assertion that Columbia regarded him as mentally disabled. Thus, there is no evidence in the record from which a jury could find that Columbia considered Vosatka to be psychologically impaired.

Even if Vosatka had demonstrated that he was regarded as psychologically impaired, Vosatka's claim would still fail because his perceived impairment would not substantially limit him in any major life activity. At oral argument, Vosatka's counsel asserted that Vosatka was regarded by Columbia as substantially limited in the major life activity of working. However, Vosatka provides no evidence from which a factfinder could so find. Assuming, without deciding, that working constitutes a major life activity, the Supreme Court in Sutton v. United Airlines held that "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs" or a broad range of jobs in various classes. 527 U.S. at 491; accord 29 C.F.R. 1630.2(j)(3)(i). Vosatka has not specified any class of jobs or any range of jobs in various classes that, due to his alleged perceived psychological impairment, Columbia regarded him as substantially limited in performing. Additionally, there is no evidence in the record from which a jury could find that Vosatka's superiors at Columbia regarded him as substantially limited in his ability to

work; to the contrary, they attempted to find another lab or clinical assignment in which Vosatka could continue working in a research capacity. Vos. Tr. B at 311-25.  Vosatka's "'conjecture or surmise' about [D]efendants' perceptions and motives for discharging [him] are insufficient to create a genuine issue of material fact" as to whether Defendant regarded him as disabled. <u>Klem v. Popular Ford Sales, Inc.</u>, 975 F. Supp. 196, 202 (E.D.N.Y. 1997).  Accordingly, there is no evidence in the record from which a jury could conclude that Vosatka was regarded by Columbia as being substantially limited in the major life activity of working as a result of a perceived mental impairment.

 Because Vosatka has not proffered evidence from which a jury could find that he was regarded as disabled within the meaning of the ADA, Vosatka has failed to satisfy the second requirement for a prima facie case for discrimination under the ADA.[26]

_____

[26]At oral argument, Plaintiff's counsel stated that Vosatka did not press his prior position that he was disabled because of his Achilles tendon injury.  Even if Vosatka were to continue to press that argument, he would not be found to be disabled within the meaning of the ADA.  To determine whether an impairment substantially limits a plaintiff in performing a major life activity, a court can consider (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long-term impact, or the expected or long-term impact of or resulting from the impairment. 29 C.F.R. 1630.2(j)(2).  With respect to his leg injury, I evaluate whether Vosatka is substantially limited in the major life activities of either walking or working.

With regard to the first factor, the nature and severity of the impairment, Vosatka testified that he "can't walk too far and [has] to put his leg up often." Vos. Tr. A at 107.  Although Vosatka doesn't "walk great distances," he occasionally attempts to "get some cardiovascular exercise" and tries to help repair around the house. Vos. Tr. A at 114-16.  Additionally, Vosatka can alleviate his pain by taking a break to sit down, by leaning against a wall, or by putting his foot up. Vos. Tr. A at 114-15.  Thus, the nature and severity of the impairment do not weigh in

(continued...)

(...continued)
Vosatka's favor when examining his ability to  walk.

The second factor, the duration of Vosatka's impairment, also weighs against a finding of substantial limitation.  Vosatka may have been substantially limited in his ability to walk for the fourteen months after his surgery, during which time Vosatka was on medical leave. Def. 56.1 ¶ 24.  However, Vosatka testified that his leg is much improved from the period immediately following his injury and surgeries. <u>See</u>, <u>e.g.</u>, Vos. Tr. A 112-16.

Turning to the third factor, the permanence of the impairment, it appears that Vosatka's condition has improved with time.  Although Vosatka initially required assistance from a cane, crutches or a wheelchair, Vos. Tr. A at 112, Vosatka testified that he has currently "been walking continuously for some time . . . without any unassisting [sic] device except for some support stockings," Vos. Tr. A at 112-13.  Accordingly, the duration and permanence factors favor a finding of no substantial impairment in his ability to walk.

A careful examination of the factors set forth in 29 C.F.R. 1630.2(j)(2) reveals that although Vosatka's ability to walk may be slightly affected by his injury, Vosatka has proffered no evidence from which a jury could find he was substantially limited in walking.  The undisputed facts require this finding, especially when viewed in the context of cases where plaintiffs have been found not to suffer from a substantial limitation, despite facts tending to show a greater level of impairment than Plaintiff. <u>See</u>, <u>e.g.</u>, <u>Zuppardo v. Suffolk Co. Vanderbilt Museum</u>, 19 F. Supp. 2d 52, 53 (E.D.N.Y. 1998)(Plaintiff "was unable to walk more than 1/8 of a mile without suffering severe pain and needing to rest."); <u>Ryan</u>, 135 F.3d at 871 (Plaintiff's colitis, although permanent, does not substantially limit the major life activity of controlling the elimination of waste because her symptoms vary in intensity, and she is only symptomatic during certain months).

Furthermore, Vosatka has not demonstrated that his leg injury substantially limits his ability to work.  Although Vosatka testified that he was unable to perform his clinical duties due to the amount of walking required, being "unsuitable for a particular position" is insufficient to demonstrate a substantial limitation in the major life activity of working. <u>Daley v. Koch</u>, 892 F.2d 212, 215 (2d Cir. 1989); <u>Heilweil v. Mount Sinai Hosp.</u>, 32 F.3d 718, 723 (2d Cir. 1994).  Rather, a plaintiff must show that his impairment is "not commonplace and that [it] poses for the particular individual a more general disadvantage in his or her search for satisfactory employment." <u>Daley</u>, 892 F.2d at 215 (quoting <u>Forrisi v. Bowen</u>, 794 F.2d 931, 934-35 (4th Cir. 1986)).  Also, Vosatka has not indicated any class of jobs or any range of jobs in various classes in which his injury substantially limits him in working.  Vosatka has only alleged that he was unable to perform particular clinical duties at Columbia and does not claim to have difficulty in securing a

(continued...)

2. <u>Reasonable Accommodations</u>

Vosatka has also not discussed, either in his Complaint or moving papers, whether he could perform the essential functions of his job with or without reasonable accommodation, which is the third element of a prima facie case for discrimination under the ADA. At oral argument, Vosatka's counsel asserted that Vosatka does not claim to be disabled with regard to his leg injury and only claims to be regarded as psychologically disabled by Columbia. Thus, I will assume that Vosatka believes he could perform his job without reasonable accommodations because he does not consider himself disabled. Even if Vosatka needed a reasonable accommodation with regard to any psychological impairment in order to perform the essential functions of his job, his argument that he was not reasonably accommodated would still fail as a matter of law because Vosatka did not request any accommodations. It is the responsibility of the disabled individual to inform the employer that an accommodation is needed. 29 C.F.R. App. § 1630.9 (1999). "If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." <u>DeMar v. Car Freshner Corp.</u>, 49 F. Supp. 2d 84, 95 (N.D.N.Y. 1999)(quoting <u>Taylor v. Principal</u>

---

(...continued)

job elsewhere due to his injury. In fact, Vosatka subsequently applied for a clinical position at St. Peter's University Hospital. Additionally, those at Columbia did not regard Vosatka as substantially limited in his ability to work since they attempted to find another lab for Vosatka to continue working in his research capacity. Vos. Tr. B at 311-25. Accordingly, Vosatka has not proffered any evidence from which a factfinder could find that his leg injury substantially limits him in the major life activities of either walking or working.

<u>Fin. Group, Inc.</u>, 93 F.3d 155, 165 (5th Cir. 1996)).  Although I
assume that Vosatka can perform the essential functions of his job
without reasonable accommodations for his perceived disability,
Vosatka has not demonstrated that he is disabled or regarded as
disabled within the meaning of the ADA, which is the second element
of the prima facie case.  Therefore, I decline to evaluate the fourth
element.[27]

_____

[27]To the extent that Vosatka claims that he was denied
reasonable accommodations with respect to his leg injury,
Vosatka's claim also fails.  It appears that Vosatka received all
of the accommodations that he requested after his leg injury.
Vosatka requested and received a paid medical leave from March
2001 until May 2002. Def. 56.1 ¶ 24. <u>See</u> <u>Adams</u>, 91 Fed. Appx. at
720 ("temporary leaves of absence can be considered reasonable
accommodations.").  Vosatka also requested and received an office
within his laboratory space in order "to avoid numerous stairs
and walking." Vos. Tr. A at 142-43.  Additionally, Vosatka
admitted that Columbia assisted him in acquiring a disability
supplement, which funded equipment to assist Vosatka in his work
duties. Vos. Tr. A at 120-22.  Columbia also assigned technicians
to help Plaintiff with his work after his injury. Vos. Tr. B at
316.  Although Vosatka claims that virtually none of the funds
were expended on his behalf, it is the responsibility of the
disabled individual to inform the employer that an accommodation
is needed. 29 C.F.R. App. § 1630.9.  Vosatka has not offered any
evidence to demonstrate that he had requested a specific
accommodation to be funded by the supplement that he did not
receive.
     Vosatka also asserts that Columbia was required to offer
Vosatka a position as a research scientist with no clinical
duties.  Complaint ¶¶ 33, 38, 48.  The ADA offers a short list of
possible accommodations, which includes "reassignment to a vacant
position." 42 U.S.C. § 12111(9)(B) (2005). However, "nothing in
the law [indicates that] Congress intended to interfere with
personnel decisions within an organizational hierarchy." <u>Wernick</u>,
91 F.3d at 384.  Thus, Columbia is not obligated to make Vosatka
a tenured professor in order to allow Vosatka to continue working
exclusively as a research scientist.  Accordingly, Vosatka cannot
state a claim of disability discrimination based upon Columbia's
failure to provide reasonable accommodations.

B. <u>Reason for Adverse Action</u>

After a plaintiff makes a prima facie case of discrimination, the defendant must "rebut the presumption of discrimination by producing evidence that the plaintiff [suffered an adverse action] for a legitimate, nondiscriminatory reason." <u>Burdine</u>, 450 U.S. at 255. "The defendant need not persuade the court that it was actually motivated by the proffered reasons." <u>Id.</u> at 254. The employer is only required to "produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." <u>Id.</u> at 257.

Columbia has documented several incidents in which Vosatka behaved in a manner that caused his colleagues and subordinates to report to his superiors that Vosatka's behavior offended them and that the behavior concerned his supervisors. <u>See</u> Def. 56.1 ¶¶ 43-67. Vosatka argues that his conduct "was not significantly different from the conduct of the other research scientist and staffers in the laboratory." Pl. Opp. at 5, ¶ 7. However, when Vosatka's e-mail and comments are compared to the e-mails of his colleagues, it is indisputable that Vosatka's comments were more personal and his e-mail was more sexually explicit and thus that Vosatka's e-mail to Ms. Taylor was qualitatively different from the e-mails of Vosatka's colleagues. <u>Compare</u> Garland Decl., Ex. A <u>with</u> Pl. Aff., Ex. 1, 2. It is undisputed that Plaintiff's female subordinates complained to his superiors that they were offended by his inappropriate jokes, some of which addressed topics such as circumcision and the females' menstrual cycles. However, there is no evidence that Vosatka's

26

colleagues' e-mails were either considered offensive or complained about.

     As discussed in detail above, Dr. Polin had been advised to remove Vosatka from his prior lab. <u>See, supra</u>, II. A. 1. at 21. Also, Vosatka had requested to be removed from clinical service and never communicated an interest in resuming clinical activities. Vos. Tr. B at 320-21.  Columbia argues that, as a result, Vosatka was issued a Notice of Non-Renewal "for having no substantial means to contribute to the University." Def. Memo. at 13.[28]  "All faculty members are expected to perform research and/or clinical work in order to support a substantial portion of their salary." Polin Decl. ¶ 8.  Vosatka does not dispute that his research was primarily supported by a grant on which Dr. Stark was the principal investigator. Vos. Tr. A at 96, 139.  Thus, as a result of being unable to return to his previous lab, Vosatka was unable to continue working on the grant from which he derived the majority of his salary support. Polin Decl. ¶ 28. Since Vosatka did not pursue other laboratory opportunities, he "simply had no work that he could perform for the University. Therefore his non-renewal became effective on June 30, 2004." Polin Decl. ¶ 32.  Accordingly, Columbia has proffered a legitimate, non-discriminatory reason for its adverse employment action as to Vosatka.

_____

[28]"Def. Memo." refers to Defendant's Memorandum of Law in support of its Motion for Summary Judgment dated January 3, 2005.

C. <u>Pretext</u>

Vosatka contends that the reasons given by Columbia are a pretext for discrimination.  Once a defendant has proffered a legitimate, non-discriminatory reason for the adverse action, "'the prima facie case is rebutted.'"  <u>St. Mary's</u>, 509 U.S. at 507 (quoting <u>Burdine</u>, 450 U.S. at 255).  A plaintiff must then demonstrate that the defendant's allegedly legitimate reasons are a pretext for discrimination. <u>Id.</u> at 515.  In order to find discriminatory intent, "there must be evidence which points to discrimination." <u>Payne v. N.Y. Power Auth.</u>, 997 F. Supp. 492, 500 (S.D.N.Y. 1998).  A plaintiff's "conclusory allegations, without more, do not give rise to an inference of discriminatory motive." <u>Barriera v. Banker's Trust</u>, No. 98 Civ. 3641 (MBM), 2003 U.S. Dist. LEXIS 18601, at *20 (S.D.N.Y. Oct. 20, 2003).

As discussed at oral argument, Vosatka's only evidence to show that Columbia's reasons for not renewing him are pretextual is the close temporal proximity between the medical evaluations and Vosatka's Notice of Non-Renewal.  As noted above, Vosatka argues that Columbia embraced the negative language in the medical evaluations, regarded Plaintiff as psychologically impaired because of that language, and soon thereafter issued a Notice of Non-Renewal as a result.  Vosatka's argument fails as a matter of law.  "Although the sequence and timing of events, alone, creates an 'inference of discrimination' sufficient to satisfy plaintiff's burden in the first step of the <u>McDonnell Douglas</u> analysis," <u>Bainlardi v. SBC Warburg, Inc.</u>, No. 97 Civ. 2861, 1998 U.S. Dist. LEXIS 13491, at *18 (S.D.N.Y.

28

Sept. 1, 1998); Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d
Cir. 1996), "the timing of events alone, even if sufficient to meet
the plaintiff's prima facie burden, cannot defeat summary judgment in
the face of defendant's proffered legitimate reason." Reilly v.
Metro-North Commuter R.R. Co., No. 93 Civ 7317, 1996 U.S. Dist.
LEXIS 17061, at *48 (S.D.N.Y. Nov. 15, 1996); See O'Dell v. Trans
World Entm't Corp., 153 F. Supp. 2d 378, 396 (S.D.N.Y. 2001)
("notwithstanding the close temporal proximity. . . no inference of
retaliatory discrimination is warranted."); Ali v. Mount Sinai Hosp.,
No. 92 Civ. 6129, 1996 U.S. Dist. LEXIS 8079, at *28 (S.D.N.Y.
June 12, 1996) (a plaintiff "cannot avoid summary judgment by 'merely
pointing to the inference of causality resulting from the sequence in
time of the events.'") (quoting Chojar v. Levitt, 773 F. Supp. 645,
655 (S.D.N.Y. 1991)).

While timing, in conjunction with other circumstances, may
provide an inference of a causal relationship, timing alone is
insufficient to sustain Vosatka's argument. See Ali, 1996 U.S. Dist.
LEXIS 8079, at *28. Accordingly, the close temporal proximity
between the medical evaluations and the Notice of Non-Renewal, alone,
is insufficient as a matter of law to infer discrimination on the
part of Columbia once Columbia has proffered legitimate non-
discriminatory reasons for the Notice of Non-Renewal. Because
Vosatka has not offered any evidence from which a jury could find
that Columbia's non-discriminatory reasons for Non-Renewal are
pretextual, his discrimination claims under the ADA and the NYHRL
must fail.

D. <u>Retaliation</u>

Vosatka claims that Columbia retaliated against him in violation of the ADA and the NYHRL.[29]  Each of these laws prohibits an employer from discriminating against an individual for opposing any practices made unlawful by the law or for participating in a proceeding under these laws. <u>See</u> 42 U.S.C. § 12203 (2005); N.Y. Exec. § 296(e) (2005).  In order to set forth a prima facie case of retaliation, Vosatka must demonstrate that (1) he engaged in a protected activity; (2) Columbia was aware of this activity; (3) Columbia took adverse action against Vosatka; and (4) a causal connection exists between the protected activity and the adverse action, "<u>i.e.</u>, that a retaliatory motive played a part in the adverse employment action." <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001) (quoting <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 208-209 (2d Cir. 1990)).

With respect to his retaliation claims under the ADA and the NYHRL, Vosatka fails to indicate any protected activities in which he engaged.  At oral argument, counsel argued that Vosatka believes he was retaliated against for verbally questioning the NIH Training Grant proposal's hours requirement.  However, even assuming that mere allegation was cognizable on summary judgment, verbally questioning the grant application during drafting is not protected activity within the meaning of ADA or the NYHRL.

---

[29]Retaliation claims brought under both the ADA and NYHRL are analyzed using the same framework as claims brought under Title VII. <u>See</u> <u>Lovejoy</u>, 263 F.3d at 223 (evaluating an ADA claim); <u>Barriera</u>, 2003 U.S. Dist. LEXIS 18601, at *22 (evaluating Title VII and NYHRL claims).

Vosatka also appears to claim that Columbia retaliated against him "with the hope of injuring his efforts to find employment by telling St. Peter's University Hospital that it could not evaluate his clinical skills although it knew that statement was untrue." Complaint ¶ 33(e). Again, assuming this mere allegation to be cognizable, case law indicates that "an employer's disagreement with her employer's evaluation of her performance is insufficient to establish discriminatory intent." Ricks v. Conde Nast Publ'n, Inc., 6 Fed. Appx. 74, 78 (2d Cir. 2001); see also Klem, 975 F. Supp. at 203 (holding that a refusal to discuss Plaintiff's employment may be a "reasonable defensive measure" adopted "to avoid subjecting [defendants] to a claim for retaliation and to avoid misleading prospective employers as to [plaintiff's] admittedly suboptimal performance."). Thus, Vosatka's claims for retaliation based on the St. Peter's Hospital form must fail as a matter of law, both under the ADA and NYHRL.

Vosatka also asserts a retaliation claim under Labor Law § 740(2)(c) (2005), which prohibits an employer from retaliating against an employee who "objects to, or refuses to participate in any such activity, policy, or practice in violation of a law, rule or regulation." New York courts have consistently held that "a cause of action predicated on Labor Law § 740 requires proof of an actual violation." Bordell v. General Elec. Co. et al., 88 N.Y.2d 869, 871 (1996); see, e.g., Hookman v. Lenox Hill Hosp., 659 N.Y.S.2d 36 (1st Dep't 1997); Green v. Saratoga A.R.C., 650 N.Y.S.2d 441, 442 (3d Dep't 1996).

Vosatka alleges that Columbia retaliated against him after he refused to work on an NIH Training Grant proposal because he believed that a provision in the grant would violate a New York Health Law. Complaint ¶ 35. Again, even assuming that allegation was cognizable on summary judgment, Vosatka has not alleged or proffered evidence that the grant application was submitted, that the NIH agreed to fund the grant, or that any fellows at Columbia worked under the grant in violation of New York laws. Thus, Vosatka's claim must fail because the grant that he refused to work on was never "in violation of a law, rule or regulation." Labor Law § 740(2)(c).

### E. Breach of Contract

Vosatka alleges that Columbia breached its employment contract with Plaintiff. However, Vosatka has not provided the Court with a copy of any employment contract. Vosatka has also failed to discuss any such contract in his moving papers. In fact, the only reference to a contract in Plaintiff's documents is his Fifth Claim for Relief, where he states "Defendant breached the contract of employment that it had enter [sic] into with Plaintiff." Complaint ¶ 46.

Vosatka admits that he never received a promise in writing from Columbia informing him that he would be appointed to a Clinical Professor of Medicine position. Vos. Tr. A at 64. Additionally, the Faculty Handbook, which Vosatka admits applied to him, does not impose a "just cause" requirement for non-renewal and does not guarantee clinical appointments for non-tenured faculty members. Vos. Tr. A at 77; Polin Decl., Ex. G at 188-89. "Contemporaneous

oral blandishments and promises allegedly made . . . cannot negate this written provision." <u>Johns v. Int'l Bus. Mach. Corp.</u>, 361 F. Supp. 2d 184, 188 (S.D.N.Y. 2005). Although Vosatka claims he was orally assured that he would be "considered for an appointment to a clinical position," Pl. Aff. ¶ 31, general assurances do not constitute binding contractual obligations affecting Vosatka's at-will employment status. <u>See</u> <u>Jaffe v. Aetna Cas. & Sur. Co.</u>, No. 93 Civ. 0385, 1996 U.S. Dist. LEXIS 8421, at *8-9 (S.D.N.Y. June 18, 1996), <u>aff'd</u>, No. 96-7886, 1997 U.S. App. LEXIS, 12804 (2d Cir. June 2, 1997); <u>Johns</u>, 361 F. Supp. 2d at 188. Thus, Vosatka's claim for breach of contract fails.

F. <u>Intentional Infliction of Emotional Distress</u>

Vosatka claims that Columbia committed the tort of intentional infliction of emotional distress. This tort is "highly disfavored under New York law." <u>Kearney v. County of Rockland</u>, No. 04 Civ. 1737 (WCC), 2005 WL 1420895 (S.D.N.Y. June 15, 2005). In order to prevail on this claim, a plaintiff must show (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. <u>Id.</u> In New York, "these elements are applied very strictly." <u>Id.</u> (citing <u>Martin v. Citibank, N.A.</u>, 762 F.2d 212, 220 (2d Cir. 1985)).

Vosatka has failed to proffer any evidence supporting the above elements. In his testimony, Vosatka stated that being sent to a psychiatrist and ultimately terminated constituted extreme and outrageous conduct. Vos. Tr. B at 405-406. However, the ADA permits

an employer to request a medical evaluation of an employee in order
to determine the employee's fitness for work. 42 U.S.C.
§ 12112(d)(4)(B).  Additionally, the terms of Vosatka's employment
were listed in the Faculty Handbook, which states that any full-time
appointment may be terminated or not renewed at the end of its stated
term as long as the faculty member receives adequate written notice.
Polin Decl., Ex. G.  Thus, the legitimate activities in which
Columbia engaged cannot be considered "extreme and outrageous."  This
is especially true in light of case law indicating that "recovery is
limited to cases where the defendant's conduct was 'so outrageous in
character, and so extreme in degree, as to go beyond all possible
bounds of decency, and to be regarded as atrocious, and utterly
intolerable in a civilized society.'" Kearney, 2005 WL 1420895,
at *12 (quoting Fischer v. Maloney, 43 N.Y.2d 553, 558 (1978)).
Because Vosatka has failed to satisfy the first requirement for a
claim of intentional infliction of emotional distress, I need not
address the remaining factors.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in its entirety. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED:

Dated: New York, New York
       August 24, 2005

_____
LORETTA A. PRESKA, U.S.D.J.